**In re CHATEAUGAY CORPORATION, Reomar, Inc., the LTV Corporation, et al., Debtors.**

**In re the LTV CORPORATION and LTV Aerospace and Defense Company, Debtors.**

**Bankruptcy Nos. 86 B 11270 (BRL)–86 B 11334 (BRL), 86 B 11402 (BRL), 86 B 11464 (BRL), 86 B 11272 (BRL) and 86 B 11276 (BRL).**

United States Bankruptcy Court, S.D. New York.

April 29, 1992.

See also 126 B.R. 165.

**600**

Kronish, Lieb, Weiner & Hellman by William J. Rochelle, III, New York City, for PRC Kentron, Inc.

Leonard Marsh Hurt Terry & Blinn, P.C. by David A. Ives, Dallas, Tex., for Kentron, Inc.

Locke Purnell Rain Harrell, P.C. by Marshall Searcy, Kendra Karlock, Sp. Counsel, Dallas, Tex., Levin & Weintraub & Crames, by Steven Fox, Edward J. LoBello, Davis Polk & Wardwell by Karen E. Wagner, Maryellen E. Abely, New York City, for debtors.

Cochran Professional Corp. by John H. Cochran, Suzanne Cochran, Dallas, Tex., for Builders Associates, Ltd.

### DECISION ON MOTION TO EXPUNGE AND DISALLOW PROOFS OF CLAIM

BURTON R. LIFLAND, Chief Judge.

## I. INTRODUCTION

The LTV Corporation ("LTV") and LTV Aerospace and Defense Company ("Aerospace") (collectively, the "Debtors") have made a motion to expunge the proofs of claim filed by Builders Associates, Ltd. ("Builders"), Kentron Pakistan, Inc. ("KPI") and PRC Kentron ("PRC Kentron"), formerly Kentron International, Inc. ("KII") (KPI and PRC Kentron, collectively, "Kentron"). The Debtors ask this Court to find (i) that Builders' claims against the Debtors cannot be supported as a matter of law, and (ii) that the claims Builders has against Kentron are not subject to indemnification by the Debtors. Each issue shall be addressed separately.[1]

---

**1.** This Court notes that, in addition to the Debtors' motion to expunge, Builders and Kentron have filed cross-motions for summary judgment against each other. (Builders has filed a Conditional Motion for Partial Summary Judgment against Kentron and Kentron has filed a Cross-motion for Summary Judgment against Builders.) They have done this by simply filing notices of motion scheduling their cross-motions for the same date as the Debtors' hearing on objection to their claims. No adversary proceeding has been brought by either party. The issues underlying the cross-motions for summary judgment, as well as the issues underlying Builders' and Kentron's claims, are the subject of a lawsuit which Builders has brought against the Debtors and Kentron in the United States District Court in Texas (defined below as the Texas Lawsuit). Since the filing of the Debtors' petitions in this Court, the Texas Lawsuit has been subject to the automatic stay as to actions against the Debtors, and so far as can be ascertained, is dormant with respect to Builders claims against Kentron.

The Texas Lawsuit, with its distinct alignment of parties and causes of action, has never been removed to this Court. The instant matter is simply an objection to claims under § 502 of the Bankruptcy Code. The non-debtor claimants seek relief against each other by grafting their motions onto the Debtors' motion to expunge their claims. A canvass of their motions makes it clear that summary judgment is inappropriate in this contested matter. The appropriate forum for the non-debtor claimants to

## II. FACTUAL BACKGROUND

In 1978, the government of Pakistan, through the Pakistani Railway Board (the "PRB"), invited bid proposals for a telecommunications network and signaling system for the Pakistani railway (the "Project").

KII, a then wholly-owned subsidiary of LTV, agreed with Zimpex Limited ("Zimpex"), a Pakistani corporation, to bid on the Project. It was understood that KII or its designated subsidiary would be the prime contractor, while Zimpex would be the sub-contractor.

Subsequently, Zimpex entered into an agreement with Builders under which Builders agreed to be Zimpex's sub-contractor on the Project, and agreed to provide a bond for the full value of Builders' work.

Finally, KII and Zimpex entered into an agreement, dated December 3, 1979 (the "KII Agreement"), which provided that, with regard to the Project, KII would be the prime contractor, Zimpex would be the sub-contractor, and Builders would be Zimpex's sub-contractor. It was also agreed that any contract with the PRB would be with KII's wholly-owned subsidiary, KPI. Although not a party to the KII Agreement, Builders signed a concurrence.

Following these agreements, there were a few written communications by LTV regarding the Project, none of them addressed to Builders. LTV circulated an internal memorandum entitled "White Paper" (the "LTV White Paper"), dated February 4, 1980, which stated that analysis of KPI's bid indicated that either KPI erroneously underestimated the Project, or was attempting to buy its way in, with the objective of either driving up the price later, or supplying inferior work. In addition, LTV telexed three letters to the PRB (collectively, the "LTV Telexes"). First, LTV telexed a letter to the PRB to assure them that LTV would "carefully monitor and guide KPI's progress throughout the program should they be awarded the con-

tract," and that "the resources of LTV will be available to [KPI] to bring the Project to a successful and satisfactory conclusion for all parties." Telex from Paul Thayer, Chairman of LTV, to Gulzar Ahmad, Chairman of the PRB (Feb. 26, 1980). Then LTV telexed the PRB stating that "KPI is an LTV Company" and that "the LTV Corporation is responsible for and will fully support KPI in the performance of the Pakistan Railway Project." Telex from Thayer to Ahmad (Feb. 27, 1980). Subsequently, the PRB telexed LTV requesting of LTV, "written certific[ation] ... [of] full financial backing towards satisfactory performance of the Project." Telex from the PRB to LTV (May 20, 1980). In response, LTV telexed the PRB to "confirm ... that KPI is a wholly-owned subsidiary of LTV, and as such, has its full financial and management backing." Letter from Raymond Hay, President of LTV, to A.H. Sultan of the PRB (May 27, 1980).

KPI was awarded the Project by the PRB in October, 1980. Following that, in March, 1981, KII, KPI's parent, was merged into LTV, and became LTV's Kentron Division.

On June 29, 1981, two sub-contract agreements for the Project were signed: one between KPI and Zimpex (the "KPI Sub–Contract Agreement"), and one between Zimpex and Builders (the "Zimpex Sub–Contract Agreement").

In August, 1982, LTV, under an Asset Purchase Agreement (the "Asset Purchase Agreement") sold the assets of its Kentron Division (formerly KII), including the stock of KPI, to Kentron Acquisition Corporation, which then changed its name to KII.[2] As part of the Asset Purchase Agreement, LTV agreed to continue funding the bulk of the Project. One of the conditions of the sale was that the KPI management (formerly chosen by LTV) remain in place. Another condition was that LTV retain the right to monitor the Project.

pursue their suits against each other is in the pending Texas litigation where they enjoy issue joinder as to each other.

**2.** In 1985, PRC Acquisition Corporation, a wholly-owned subsidiary of Planning Research Corporation, acquired the new KII and changed its name to PRC Kentron.

On October 30, 1982, KPI, Zimpex and Builders entered into an Indemnification Agreement entitled "Agreement Regarding Performance Bonding For Pakistan Railway Telecommunications and Related Signalling Project Tender" (the "Builders Indemnification Agreement") wherein the parties agreed that if the performance bonds were encashed, the party at fault would indemnify the others.

In October, 1983, with the Project uncompleted and its estimated cost of completion well over the original bid, LTV ceased funding the Project. KPI abandoned the Project shortly thereafter. As a result, Builders, as Zimpex's sub-contractor, could not complete the work for the PRB, and its bond for approximately 8.5 million Rupees was encashed.

## III. BUILDER'S CLAIMS

■ Builders' claims against the Debtors for losses caused by KPI's abandonment of the Project are based on theories of breach of contract, promissory estoppel, quantum meruit, fraud, tortious interference, and breach of the duty and covenant of good faith and fair dealing.[3] Each claim shall be examined individually.

**3.** Builders' claims against the Debtors are governed by state law. However, none of the parties have raised the issue of choice of law. Instead, they have applied the laws of the State of Texas. Where the parties do not raise the issue of choice of law, the court is not obliged to raise it *sua sponte*. *See Deep S. Pepsi–Cola Bottling Co. v. Pepsico, Inc.*, No. 88 Civ. 6243, 1989 WL 48400, at *12, 1989 U.S. Dist. LEXIS 4639, at *24 (S.D.N.Y. May 2, 1989) ("Although the parties do not concede that [Texas] law applies, only [Texas] cases are cited in their briefs. No conflict between the laws of the interested states has been demonstrated. Under the circumstances, the court does not feel obliged to undertake an investigation to determine whether there is any [conflict]...."). Nonetheless, a cursory investigation by this Court has revealed substantial similarity among the laws of the potentially applicable jurisdictions with regard to the common law issues involved in this case. *See* 38 A.L.R.3d 1102 (alter ego); 48 A.L.R.2d 1069 (promissory estoppel); 2 A.L.R.2d 406 (agency); *Barclay Arms, Inc. v. Barclay Arms Assocs.*, 74 N.Y.2d 644, 542 N.Y.S.2d 512, 540 N.E.2d 707 (1989) (fraud); *Martin H. Bauman Assocs., Inc. v. H & M Int'l Transp., Inc.*, 171

### A. Breach of Contract

Builders' asserts that the contracts under which it undertook to build the Project have been breached, and that LTV is liable for the breach. Although LTV is not a signatory to any of the contracts with Builders, Builders asserts that LTV is liable under two alternative theories: first, that LTV was the alter ego of both KPI and KII, or second, that KPI and KII were the agents of LTV. Thus, under either theory, Builders' contract is actually with LTV. In examining these arguments, it is assumed that the contracts that Builders has with KII and KPI have indeed been breached.[4] The only issue here is whether LTV is liable for any damages caused by such breach.

#### (i) *Alter Ego*

Builders contends that under both the Builders Indemnification Agreement (among Builders, KPI and Zimpex) and the KII Agreement (between KII and Zimpex to which Builders concurred),[5] its contractual relationship was in fact with LTV, because LTV was the "alter ego" of both KII and KPI. To support this assertion, Builders lists a variety of behavior that LTV engaged in, which it says irrefutably establishes an alter ego relationship between KII, KPI and LTV.[6] Although LTV

A.D.2d 479, 567 N.Y.S.2d 404 (1991) (quantum meruit); *Schulz v. Washington County*, 157 A.D.2d 948, 550 N.Y.S.2d 446 (1990) (tortious interference); *Duane Jones Co., Inc. v. Burke*, 306 N.Y. 172, 117 N.E.2d 237 (1953), *Overmyer v. Todd*, 77 A.D.2d 919, 431 N.Y.S.2d 111 (1980) (good faith). Therefore, this Court will apply Texas law in accordance with the parties' briefs.

**4.** It is likely that Builders does in fact have viable contract claims against Zimpex for breach of the Zimpex Sub–Contract Agreement as well as against Zimpex and KPI under the Builders Indemnification Agreement for the encashment of its bond. It is less clear whether Builders has a claim against Zimpex and KII under the KII Agreement.

**5.** This Court does not address the issue of whether a concurrence makes Builders a party to this agreement, or simply a third party beneficiary.

**6.** In particular, Builders asserts, and no party denies, that LTV arranged and funded KPI's bonding obligation, LTV loaned KPI money,

does not deny the pattern of conduct, this Court finds that it is not sufficient to establish that LTV is the alter ego of either KII or its wholly-owned subsidiary, KPI.

The theory of alter ego is used to pierce the corporate veil of a corporation in order to reach the responsible shareholder and hold it liable when to do otherwise would be to work an injustice. Thus, where a corporation is operated as a mere tool or business conduit of its shareholders, and respect for the corporate shield would deny a plaintiff just relief, courts may pierce the shield and hold the shareholder liable as the alter ego of the corporation. *Castleberry v. Branscum*, 721 S.W.2d 270 (Tex. 1986). While courts should not shrink from their duty to disregard the corporate form where justice warrants, it must be remembered that piercing the corporate veil is an extraordinary equitable remedy that should only be granted where circumstances exist which compel such action. *See Lucas v. Texas Indus.*, 696 S.W.2d 372, 374 (Tex.1984); *Torregrossa v. Szelc*, 603 S.W.2d 803, 804 (Tex.1980). Courts are cautious in applying this doctrine, mindful that indiscriminate piercing of the corporate veil could undermine one of the fundamental purposes of the corporate form. Generally, courts respect the separateness of parents and subsidiaries, "even in instances where one may dominate or control the other." *Norton v. Integral Corp.*, 584 S.W.2d 932, 935 (Tex.Ct.App.1979). Consequently, the common situation in which one corporation owns all of the stock of another, the two corporations share common officers and directors, and they are intimately related in jointly transacting their business for mutual benefit, typically does not warrant holding that the two corporations are in legal effect but one corporate entity. *See Homart Dev. Co. v. Tuxedo Charley's, Inc.*, No. B14–89–01040–CV, 1990 WL 194491, 1990 Tex.App. LEXIS 2931 (Dec. 6, 1990). The parent is only held liable for the subsidiary's contracts when the corpo-

rate arrangement is likely to achieve "an inequitable result by bringing into operation a basically unfair device, that in all probability will result in prejudice [to those dealing with the corporation]...." *Id.*

■ In sum, under *Castleberry* and its progeny, the imposition of alter ego liability requires a showing that (1) the corporation was operated as a mere tool or business conduit of the shareholder, *and* (2) it was operated in such a manner that respect for the corporate shield would deny the plaintiff just relief. Neither element is present in the instant case.

■ Builders is unable to show that KPI or its parent KII are mere business conduits of LTV. Even if, assuming *arguendo*, the facts Builders cites in its brief are true, LTV was not in control of these entities. According to Builders, LTV learned of the contents of KPI's bid some time after the bid was submitted. Builders cites the LTV White Paper, an LTV internal memorandum, which states that when LTV analyzed the bid it concluded that either KPI erroneously underestimated the project or was purposely attempting to buy its way in, intending either to drive up the price later or to supply inferior work. The fact that LTV did not know the contents of KPI's bid prior to its submission, coupled with the fact that LTV did not know why KPI submitted such a low bid in the first place, suggests that LTV was not in control of KPI's actions with regard to this transaction, and that KPI operated with a fair degree of independence. It should also be noted that, at the time that KPI allegedly breached its contract with Builders, KPI was no longer a subsidiary of LTV.

Even if Builders were able to show that LTV did control KPI or KII, it would still have to show that such control was exercised to commit fraud, to violate other legal duties, or to act dishonestly or unjustly in contravention of Builders' legal rights.[7]

LTV furnished legal services to KPI, LTV handled KPI's press releases, LTV required KPI's letterhead to include the phrase "an LTV company", LTV and KII filed consolidated financial statements, LTV represented to third parties

that LTV backed KPI, and directors and officers of KPI were picked by and reported to LTV.

7. Factors leading to such a determination include undercapitalization, improper siphoning of funds, failure to maintain separate records,

As the court stated in *Lucas v. Texas Indus., Inc.:*

> There must be something more than mere unity of financial interest, ownership, and control for a court to treat a subsidiary as the alter ego of the parent.... The corporate entity of the subsidiary must have been used to bring about results which are condemned by the general statements of public policy.... The plaintiff must prove that [it] has fallen victim to a basically unfair device by which a corporate entity has been used to achieve an inequitable result. 696 S.W.2d 372, 374 (Tex.1984).

In the instant case, there has been no such showing.

██ Finally, courts are generally more reluctant to pierce the corporate veil for a voluntary or contract creditor, than for an involuntary or tort creditor. This is because the voluntary creditor chooses to contract with a subsidiary, and presumably receives the promise for which it has bargained. *Homart Dev. Co. v. Tuxedo Charley's, Inc.*, 1990 WL 194491, at *3, 1990 Tex.App. LEXIS 2931, at *7 ("The very reasonable question must be met and answered why one who contracted with the subsidiary and received the promise which he bargained for but who has been disappointed in the fulfillment by the subsidiary of its commitment should then be allowed to look to the parent."); *Lasky v. Ingram*, No. A14–90–00157–CV, 1991 WL 207121, at *2, 1991 Tex.App. LEXIS 2565, at *7 (Oct. 17, 1991) ("Without reasonable reliance on the financial backing of the [parent], a contract claimant can not avoid the risk ... that it originally accepted as part of the bargain."); *See also Lucas*, 696 S.W.2d at 375 ("absent some deception or fraud the risk of loss is apportioned by virtue of relative bargaining power."). Thus, because Builders is a contract creditor, it would have to make an even stronger showing to convince the court to apply the unusual equitable remedy of piercing

formalities, operations and property, misleading creditors as to parent's backing, etc.

the corporate veil—a showing it is unable to make.

### (ii) *Agency*

In addition to its claim that LTV is the alter ego of KPI and KII, Builders argues alternatively that KPI and KII are the agents of LTV. Thus, Builders' contractual relationships with KPI under the Builders Indemnity Agreement and with KII under the KII Agreement are in fact with LTV, because KPI and KII signed those agreements as agents for LTV. This Court finds no merit to this argument.

██ One seeking to charge a party, as principal, with the obligations of a contract signed by the party's alleged agent, must prove that the signatory possessed actual or apparent authority to bind the putative principal. In the instant case, there is no evidence of actual agreement creating an agency relationship between LTV and either KPI or KII. Thus, Builder's claim must rest, if at all, upon an assertion of apparent authority.

Apparent authority exists where the defendant's conduct leads the plaintiff reasonably to believe that the party with whom the plaintiff is dealing has the authority to act as the defendant's agent. *Chastain v. Cooper & Reed*, 152 Tex. 322, 257 S.W.2d 422, 427 (Tex.1953). As described below, the facts of this case fail to establish that Builders reasonably could have believed that KPI was acting as the agent of LTV when KPI entered into the contract with Builders.[8]

To support its claim of agency, Builders argues that, in communications with the PRB, LTV represented that it would "carefully monitor and guide KPI's progress throughout the program should they be awarded the contract" (Telex from Paul Thayer, Chairman of LTV, to Gulzar Ahmad, Chairman of the PRB (Feb. 26, 1980)) and that "KPI is a wholly owned subsidiary of LTV, and as such, has its full financial and management backing" (Letter from

8. Builders offers no evidence at all that KII was acting as LTV's agent, other than by implication as KPI's parent.

Raymond Hay, President of LTV, to A.H. Sultan of the PRB (May 27, 1980)). While these statements are uncontroverted, they do not necessarily establish agency. They are not the words of a principal describing its relationship with its agent. If anything, these statements evidence a customary relationship of parent to subsidiary, one in which the parent, as a separate entity, agrees to oversee the activities of its subsidiary. Agency requires a unity that simply is not reflected here. A principal is *fully* responsible for contracts executed by its agent. Thus, a representation by a parent that it will monitor, guide, or support its subsidiary if the subsidiary were to be awarded a contract indicates a separateness between parent and subsidiary that should, if anything, dispel the belief that the parent expects to be bound, itself, by the contract of its subsidiary. Thus, the very evidence that Builders offers as proof of agency should have put it on notice that no agency relationship existed. It is uncontroverted that Builders received copies at the time of the communications which contained these representations. Consequently, Builders could not have reasonably believed that KPI was acting as LTV's agent.

### B. Promissory Estoppel

Builders argues that, should this Court find, as it has above, that LTV had no contractual obligations to Builders, it would assert alternatively that LTV made promises to Builders to the same effect on which it detrimentally relied, and that the equitable doctrine of promissory estoppel should be invoked against the Debtors. This Court does not agree.

■ The State of Texas has adopted the doctrine of promissory estoppel as set forth in the Restatement of Contracts § 90. *Fretz Constr. Co. v. Southern Nat'l Bank of Houston,* 626 S.W.2d 478 (Tex.1981). Section 90 provides, in pertinent part, as follows:

A promise which the promisor should reasonably expect to induce action or for-

bearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

This has been interpreted as a three-part test, the elements of which are (1) the existence of a promise, (2) the foreseeability of reliance on that promise, and (3) actual, substantial reliance by the promisee to his detriment. *See English v. Fischer,* 660 S.W.2d 521 (Tex.1983).

Technically, promissory estoppel is not a cause of action. Rather, it estops a defendant from raising certain defenses to a cause of action. Thus, where a promise has been foreseeably relied on to one's detriment, the promisor may be estopped from asserting that the promise is legally unenforceable (*e.g.,* for noncompliance with the Statute of Frauds) if justice requires that the promise be enforced. *"Moore" Burger, Inc. v. Phillips Petroleum Co.,* 492 S.W.2d 934 (Tex.1972) ("... [Promissory estoppel] does not create a contract where none existed before, but only prevents a party from insisting upon his strict legal rights when it would be unjust to allow him to enforce them.... The function of promissory estoppel is ... defensive in that it estops a promisor from denying the enforceability of the promise."); *Briercroft Sav. & Loan Ass'n v. Foster Fin. Corp.,* 533 S.W.2d 898 (Tex.Ct.App.1976) ("... An estoppel is defensive in character. It does not create a cause of action. Its function is to preserve rights, and not to bring into being a cause of action.").

■ However, it is axiomatic that promissory estoppel can only be invoked when a promise has been made. Absent a promise, the doctrine of promissory estoppel is inapplicable. Thus, promissory estoppel is inapt here because Builders is unable to show any promise by LTV to Builders. While the parties may agree that LTV made a promise to the PRB to guarantee KPI's obligation to the PRB,[9] this does not imply that LTV made a similar promise to

---

**9.** This guarantee may in fact have been the basis for the PRB's action against LTV, which was ultimately settled by those parties.

Builders to guarantee KPI's obligations to it. KPI had wide-ranging obligations to various parties. A guarantee of one of those obligations to one of the parties is not a blanket guarantee of all of KPI's obligations to all parties. Absent evidence of a promise by LTV to Builders, Builders cannot satisfy even the first element of the doctrine of promissory estoppel.

### C. Quantum Meruit

Again, Builders argues that, in the absence of a finding of a contract between Builders and LTV, it asserts an alternative claim against the Debtors in quantum meruit. Again, this Court does not agree.

■ The right to recover in quantum meruit is based upon the promise implied by law to pay for beneficial services rendered and knowingly accepted. Recovery in quantum meruit is appropriate where payment for the services rendered is required in order to prevent unjust enrichment of the party benefitted by the work. *See Vortt Exploration Co., Inc. v. Chevron U.S.A., Inc.*, 787 S.W.2d 942, 944 (Tex. 1990). To recover in quantum meruit a plaintiff must prove the following:

1) that valuable services were rendered or materials furnished;
2) for the person sought to be charged;
3) which services or materials were accepted by the person sought to be charged, used and enjoyed by him; and
4) under such circumstances as reasonably notified the person sought to be charged that the plaintiff in performing such services was expecting to be paid by the person sought to be charged.

*Bashara v. Baptist Memorial Hosp. Sys.*, 685 S.W.2d 307, 310 (Tex.1985).

As a general rule, a plaintiff who seeks to recover the reasonable value of services rendered or materials supplied will be permitted to recover in quantum meruit only where there is no express contract covering those services or materials. *See Truly v. Austin*, 744 S.W.2d 934, 936 (Tex.1988).

However, there are instances when recovery in quantum meruit is permitted despite the existence of an express contract that covers the subject matter of the claim. Recovery in quantum meruit is allowed when a plaintiff has partially performed an express contract but, due to the defendant's action, is unable to complete it. *Id.* Because Builders' work was explicitly covered under the Zimpex Sub–Contract Agreement, the Builders Indemnification Agreement, and arguably the KII Agreement, this case appears to fit, if at all, into this latter category.

■ However, in order to recover in quantum meruit, a "plaintiff must show that his efforts were undertaken for the person sought to be charged; it is not enough to merely show that his efforts benefitted the defendant." *Truly v. Austin*, 744 S.W.2d 934, 937 (Tex.1988). Under the *Bashara* test, the second element of a quantum meruit claim is that the plaintiff must have rendered its services for the benefit of the defendant. One can not recover compensation from a party who was an incidental beneficiary of services rendered to another. *See Bashara*, 685 S.W.2d at 310. Under the Zimpex Sub–Contract Agreement, Builders performed its services for the benefit of Zimpex, and ultimately, for KPI and the PRB, not for LTV.[10]

The third element of a quantum meruit claim is that the defendant must have accepted the services for its use and enjoyment. However, the services rendered by Builders were accepted by Zimpex, KPI and the PRB—not LTV.

Finally, the fourth element of a quantum meruit claim requires that the circumstances must have reasonably notified the defendant that the plaintiff was expecting to be paid by him. Under none of the express contracts, including the Zimpex Sub–Contract Agreement, did Builders have a right to receive payment from LTV.

---

**10.** Builders might argue that LTV derived a benefit from its work, in that LTV's settlement with the PRB was arguably lower than it might have been had Builders not performed at all under its contract with Zimpex. However, such benefit to LTV is incidental, and not subject to a claim in quantum meruit.

Furthermore, Builders offers no evidence that reasonable notice, or indeed any notice, was given to LTV that Builders was expecting to be paid by LTV.

Thus, for the reasons stated above, Builders claim against LTV in quantum meruit must be denied.

### D. Fraud

Builders asserts that LTV's representations to the PRB that it would support KPI in its performance of the Project fraudulently induced Builders to enter into various contracts related to the building of the Project to its detriment. This Court cannot agree. First, because LTV made the representations at issue to the PRB, *not* to Builders, only the PRB may maintain an action in fraud against LTV based on these representations. Second, the evidence overwhelmingly indicates that when LTV represented to the PRB that it would support KPI, LTV fully intended to do so.

To establish a cause of action for fraud, a plaintiff must show (1) that the defendant made a material representation; (2) that it was false; (3) that the defendant knew it was false when he made it, or that he made it recklessly, without knowledge of its truth; (4) that the defendant made it with the intention that the plaintiff would act upon it; (5) that the plaintiff acted in reliance on it; and (6) that the plaintiff suffered injury thereby. *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex.1983).

For a representation to be fraudulent, it must be made with the purpose and effect of inducing action or forbearance on the part of the plaintiff. Consequently, "a person making a representation is only accountable for its truth or honesty to the very person or persons whom he seeks to influence; no one else has a right to rely on the representation and to allege its falsity as a wrong to him." *Meadows v. Bierschwale*, 516 S.W.2d 125 (Tex.1974). In the present case, the representations at issue were contained in the LTV Telexes sent by LTV to the PRB. The purpose of the LTV Telexes was to allay the PRB's concerns about KPI's ability to complete the Project. There is simply no evidence to support an allegation that LTV intended Builders to act in reliance upon the statements contained in these communications.

Furthermore, a representation that one will do an act in the future can only be fraudulent if the party making such representation does not intend to perform that act. *See Ferguson v. DRG/Colony N., Ltd.*, 764 S.W.2d 874, 888 (Tex.Ct.App. 1989). The intent is, of course, determined at the time at which the representation is made. However, the intent is usually inferred from the party's subsequent acts. There is ample evidence indicating that when LTV represented to the PRB that it would support KPI in its performance of the Project, LTV intended to do just that. Indeed, it is uncontroverted that LTV supported KPI financially throughout much of the Project. The support was withdrawn in response to events which occurred years after the representations were made. Thus, this Court finds no basis for Builders' allegations of fraud.

### E. Tortious Interference

Under the Asset Purchase Agreement between LTV and PRC Kentron (formerly KII), LTV agreed to continue funding the direct costs incurred by KPI in performing the Project to the extent that they exceeded revenues. However, in October of 1983, with rising Project costs and no foreseeable date of completion, LTV ceased funding the Project. KPI (the general contractor) abandoned the Project shortly thereafter, thereby breaching the KPI Sub–Contract Agreement with Zimpex (KPI's sub-contractor) and resulting in Zimpex's breaching the Zimpex Sub–Contract Agreement with Builders (Zimpex's sub-contractor). Based on these facts, Builders asserts that LTV tortiously interfered with the Zimpex Sub–Contract Agreement when LTV ceased funding KPI under the Asset Purchase Agreement.

To prevail in an action for tortious interference, plaintiff must show all the elements of tortious interference, to which defendant must have no justifiable defense. The elements for a prima facie cause of

action for tortious interference consist of (1) the existence of a contract subject to interference; (2) an intentional act that interferes with this contract; (3) proximate cause; and (4) actual damages. *Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.*, 793 S.W.2d 660, 664 (Tex 1990). In the instant case, although most of the elements of prima facie tortious interference are present, the existence of proximate cause is tenuous. The chain of causation between LTV's failure to advance funds under the Asset Purchase Agreement and Zimpex's failure to pay Builders under the Zimpex Sub–Contract Agreement is somewhat remote. However, even assuming that Builders could establish a prima facie case of tortious interference against LTV, the affirmative defense of privilege, also known as excuse or justification, shields LTV from liability under the facts of this case.

One is privileged to engage in conduct which interferes with contractual relations between other parties where the purpose of such conduct is to protect one's own financial interests. *See* Restatement (Second) of Torts § 769. More precisely, the defense of privilege exists where (1) the act of interference is a bona fide exercise of the actors own rights, or (2) the actor has an equal or superior right in the subject matter to that of the other party. *Texas Real Estate Comm'n v. Nagle*, 767 S.W.2d 691 (Tex.1989). Such right need only be colorable to sustain a defense of privilege. *Sakowitz, Inc. v. Steck*, 669 S.W.2d 105, 107 (Tex.1984).

For example, a party's assertion of its rights under a contract is generally privileged, even though such action may interfere with another party's ability to perform its other contracts with third parties. Whether such action is privileged depends upon the actor's purpose. Where the actor's purpose is to interfere with the contracts of third parties, its action will not be privileged. However, where the actor's purpose is to protect its own financial interest, its action generally will be privileged. *American Nat'l Petroleum Co. v. Transcontinental Gas Pipe Line Corp.*, 798 S.W.2d 274, 279 (Tex.1990) ("a knowing and

intentional breach of one's direct contract may also be an act tortiously interfering with a third party's contract if it is done *with a purpose and effect* of preventing the third party from performing its contract...." (emphasis added)). Thus, if LTV ceased funding for the purpose of preventing KPI from performing under its contract with Zimpex, or for the purpose of preventing Zimpex from performing under its contract with Builders, then such action would not be privileged. However, there is no evidence that LTV acted for any purpose other than to protect itself from the financial drain that the continued funding of the Project constituted. Thus, because the evidence overwhelmingly indicates that LTV acted to protect its own financial interests, its action was privileged, and constitutes a full defense against Builders' claim of tortious interference.

### F. Good Faith and Fair Dealing

Finally, Builders asserts that LTV is liable in tort for breach of the duty of good faith and fair dealing, and in contract for breach of the covenant of good faith and fair dealing. This Court does not agree. No relationship existed between LTV and Builders from which the duty of good faith might have arisen, and no contract existed between the parties which could have given rise to an implied covenant of good-faith.

The duty of good faith and fair dealing arises only where there is a special relationship between the parties. The duty arises, for example, in fiduciary relationships and in the relationships between insurers and their insureds. *See Chitsey v. Nat'l Lloyds Ins. Co.*, 738 S.W.2d 641 (Tex. 1987). In the instant case, Builders shared no special relationship with LTV. Builders was merely a sub-contractor of Zimpex, itself a sub-contractor of KPI, a subsidiary of LTV. The relationship is simply too remote to charge LTV with the special duty of good faith and fair dealing which Builders claims.

In some jurisdictions there is implied in every contract a covenant of good faith and fair dealing between the contracting par-

ties. However, this is *not* the case in the State of Texas, whose law both parties have consistently applied in this case. *English v. Fischer*, 660 S.W.2d 521 (Tex. 1983). Even if Texas uniformly implied such a covenant, there can be no such covenant between LTV and Builders because there was never any contract between these two parties. As this Court has noted above (*see supra Breach of Contract*), Builders contracted with Zimpex, KPI and even arguably with KII, but never directly with LTV. Given these facts, Builders' attempt to impose a covenant of good faith and fair dealing on LTV is misguided.

## IV. INDEMNIFICATION CLAIMS OF KENTRON

Kentron has filed claims against the Debtors based on Kentron's potential liability to Builders under certain litigation pending in Texas, which has been stayed as to the Debtors following LTV's bankruptcy filings (the "Texas Lawsuit").[11] Kentron asserts that, under an indemnity agreement known as the Settlement Agreement, dated December 21, 1984, among KII (predecessor of PRC Kentron), LTV, KPI, and Aerospace (the "Kentron Indemnity Agreement"), LTV is contractually bound to defend Kentron against Builders in the Texas Lawsuit and to indemnify Kentron for any loss which it may suffer as a result. LTV disputes these claims, and has filed objections asserting that the Kentron Indemnity Agreement does not cover the Texas Lawsuit. For the reasons outlined below, this Court finds that the relevant language of the Kentron Indemnity Agreement is ambiguous, but that the parties' course of performance definitively illustrates that Kentron's interpretation accords with the true intent of the parties.

■ Historically, in order to settle a dispute between Kentron and LTV regarding the Asset Purchase Agreement (covering the sale by LTV to PRC Kentron of certain LTV assets including the stock of KPI), the Debtors and Kentron entered into the Kentron Indemnity Agreement. Under the Kentron Indemnity Agreement, the Debtors agreed to indemnify Kentron for claims arising from certain named lawsuits. One of the named lawsuits was brought by Builders against Kentron and LTV in Pakistan (the "Pakistani Lawsuit").[12] The Pakistani Lawsuit was subsequently dismissed. Prior to its dismissal, the Texas Lawsuit, a parallel lawsuit, was commenced by Builders in the United States District Court in Texas, wherein it asserted claims against Kentron and LTV which were virtually identical to those it asserted in the Pakistani Lawsuit. The Texas Lawsuit was not named in the Kentron Indemnity Agreement. The instant dispute involves an interpretation of the Kentron Indemnity Agreement to determine whether it limits indemnification by LTV to the lawsuits named (thus including the Pakistani Lawsuit and excluding the Texas Lawsuit), or whether it includes the *claims* which are the subject of the named lawsuits, and which could be the subject of other litigation as well (thus including the Texas Lawsuit, which asserts the same claims as the Pakistani Lawsuit). A close analysis of the language of the Kentron Indemnity Agreement reveals some ambiguity as to this point.

The Kentron Indemnity Agreement provides, in pertinent part:

2. LTV shall henceforth assume the defense of and hereby assumes the complete responsibility for the following claims (or potential claims) and indemnifies Kentron and KPI from and against any and all loss ... which may result from, arise out of or be related to such claims: ...

ii) All claims asserted or which may be asserted by amendment, supplement or otherwise by the plaintiffs against LTV, Kentron or KPI in the lawsuit styled

---

**11.** The Texas Lawsuit is a suit brought by Builders in the U.S. District Court in Texas (Cause No. CA3–85–1898H) against Kentron and the Debtors, seeking damages due to KPI's abandonment of the Project and the resulting encashment of Builders' bond by the PRB.

**12.** The name of this lawsuit is *Builders Associated, Ltd. v. Federation of Pakistan et al.*

*Builders Associates, Inc. v. Federation of Pakistan, The LTV Corporation, Kentron International, Inc., Kentron Pakistan, Inc., Zimpex, Ltd., and Dubai Bank, Ltd.,* which is now pending in the Court of the Senior Civil Judge, Lahore Pakistan.

The lawsuit referenced in subparagraph (ii) (the Pakistani Lawsuit) was subsequently dismissed. Prior to the dismissal of the Pakistani Lawsuit, the Texas Lawsuit was commenced. Under the Texas Lawsuit, Builders asserted claims against the Debtors and Kentron which were virtually identical to those which were asserted under the Pakistani Lawsuit. The Debtors argue that the indemnity provision was intended to cover only the specific lawsuits delineated therein. Thus, the dismissal of the Pakistani Lawsuit released the Debtors from any obligation they may have had with respect to it. According to the Debtors, the reassertion of these claims in the Texas Lawsuit is an entirely different matter, and not one covered under the Kentron Indemnity Agreement. Kentron contends that the Kentron Indemnity Agreement pertains to claims, not to lawsuits, and that these claims are covered wherever they may be asserted. As noted earlier, this Court finds that the language of the Kentron Indemnity Agreement is somewhat ambiguous with regard to the issue in question.

Paragraph 2 of the Kentron Indemnity Agreement states that LTV shall indemnify Kentron [13] for "any and all loss ... which may result from, arise out of or be related to such *claims* " (emphasis added) as subsequently described. This language indicates that the events of indemnification are the losses suffered by Kentron as a result of the *claims* against them, irrespective of where those claims are asserted. However, in subparagraph (ii), the language indicates that only those losses resulting from the identified lawsuits are covered. It is therefore unclear whether these particular lawsuits are identified in order to establish which claims are covered, or in order to limit indemnification to losses flowing only from these particular suits.

Unfortunately, a search for clarification in other provisions of the Kentron Indemnity Agreement is unavailing. For example, paragraph 10 of the Kentron Indemnity Agreement states that the indemnity provisions "are intended to cover only specific *disputes* arising out of and relating to the Asset Purchase Agreement." (emphasis added) It is uncertain whether the term "disputes" refers to the legal disputes, *i.e.,* the named lawsuits, or to the actual underlying disputes which gave rise to those suits, *i.e.,* the claims. Furthermore, paragraph 3 of the Kentron Indemnity Agreement, which states that Kentron will indemnify the Debtors for certain losses, excepts from coverage "claims assumed by LTV in paragraph 2" [14] and "any loss or liability arising out of *Gold v. LTV, et al.,* No. CA3–84–0380, which is now pending in the U.S. District Court for the Northern District of Texas." This specific exception drafted into the Kentron Indemnity Agreement indicates that, where the drafters wished to limit coverage to the liability arising out of a particular lawsuit, they were able to so specify unambiguously. This suggests that where such limiting language was not employed, as in paragraph 2, a more expansive interpretation was intended. Alternatively, this may simply suggest inconsistent drafting.

**13.** The Debtors have maintained that, even if this Court finds LTV liable to Kentron under the Kentron Indemnity Agreement, Aerospace is not liable. This Court does not agree. Although the Debtors have correctly indicated that Aerospace is not liable under clause 2 of the Kentron Indemnity Agreement, Aerospace is liable under clause 8. In fact, it is in clause 8 that Aerospace jointly assumes any and all liability LTV may have under clause 2.

**14.** Under paragraph 3 of the Kentron Indemnity Agreement, Kentron is required to indemnify the Debtors for any liability arising from the Project other than liability resulting from "those claims and potential claims specifically assumed by LTV in paragraph 2 of this Agreement...." The Debtors contend that not only are they free from the obligation to indemnify Kentron for liability flowing from the Texas Lawsuit, but that Kentron is required to indemnify them. Because this Court has held that LTV, under paragraph 2, has indemnified Kentron for the Texas Lawsuit, liability for that lawsuit is excepted from paragraph 3.

Thus, the language of the Kentron Indemnity Agreement lends itself to either of the two interpretations which have been advanced by the parties. Where there is doubt as to the meaning of a contract, the court should consider the interpretation placed upon it by the parties, as evidenced by their course of performance. The acts of the parties indicate the construction they place upon the contract, and great weight should be given to the interpretation placed upon the contract by the parties themselves. *See Dorchester Gas Producing Co. v. Hagy*, 748 S.W.2d 474, 478 (Tex.Ct. App.1988) ("The court should adopt the construction of the instrument as placed upon it by the parties unless there is *clear language* in the instrument indicating an intention to the contrary." (emphasis added)); *Mapco, Inc. v. Pioneer Corp.*, 615 F.2d 297, 301 (5th Cir.1980) ("The foundation of this principle is that a person's construction of his own language constitutes the highest evidence of his intentions.").

A proper analysis of the parties' course of performance requires this Court to examine their prior conduct with respect to the Texas Lawsuit, to see whether some indication of their intent with regard to the Kentron Indemnity Agreement can be deduced. It is undisputed that, from the inception of the Texas Lawsuit, and continuing unabated for two years, even while the Pakistani Lawsuit was pending, the Debtors defended Kentron in the Texas court, covering all their expenses, and providing legal advice. In fact, it was not until the Debtors filed for bankruptcy that they terminated their defense of Kentron in the Texas Lawsuit. It is disingenuous for the Debtors now to claim, in the face of their two year defense of Kentron in the Texas Lawsuit, that they never intended to obligate themselves to defend Kentron in any suit not specified in the Kentron Indemnification Agreement. Thus, by their own actions, the Debtors have demonstrated that

the interpretation which they now advance is contrary to their prior course of performance, and contrary to the original intent of the parties.

Thus, this Court finds that the intent of the parties under the Kentron Indemnification Agreement, as illustrated by their course of performance, was to include, as part of the Debtors' obligations, indemnification by the Debtors for any losses and expenses resulting from the Texas Lawsuit. However, it should be noted that this decision relates solely to the Texas Lawsuit and to the claims currently pled therein. No claim other than those currently pending in the Texas Lawsuit, nor any suit other than the Texas Lawsuit, is addressed by this opinion.

## V. CONCLUSION

In accordance with the foregoing, it is hereby found and determined that, for the reasons set forth above, (1) the Debtors' motion to expunge Builders' proofs of claim is granted and Builders' claims against the Debtors are disallowed; (2) the Debtors' motion to expunge the claims of Kentron, on the grounds that the claims asserted by Builders against Kentron in the Texas Lawsuit are not subject to indemnification, is denied; [15] and (3) Builders' and Kentron's cross-motions for summary judgment against each other [16] are denied.

SUBMIT AN ORDER in accordance with the foregoing.

---

**15.** The parties have not raised any issue as to the potential impact of § 502(e) of the Bankruptcy Code (concerning contingent pre-petition (*see* § 501(d)) claims for reimbursement or contribution). Thus, the application of § 502(e) to

the indemnity claims has not been addressed here.

**16.** *See supra* note 1.