**In re ENRON CORP., et al., Debtors.**

**No. 01–16034(AJG).**

United States Bankruptcy Court,
S.D. New York.

Oct. 21, 2003.

Cynthia Johnson Rerko, A Professional Corporation, Dallas, TX, Cynthia Johnson Rerko, of Counsel, for Matthew B. Arnold.

Milbank, Tweed, Hadley & McCloy LLP, New York City, Luc A. Despins, Susheel Kirpalani, Matthew S. Barr, Of Counsel, Counsel to the Official Committee of Unsecured Creditors.

Weil, Gotshal & Manges LLP, New York City, Martin J. Bienenstock, Lawrence J. Baer, Of Counsel, Attorneys for Debtors and Debtors–In–Possession.

## Memorandum Decision and Order Regarding Motion of Matthew B. Arnold for Allowance and Payment of Administrative Expense Claim

ARTHUR J. GONZALEZ, Bankruptcy Judge.

### I. Introduction

On December 16, 2002, Matthew B. Arnold ("Claimant" or "Arnold") filed a Mo-

tion (the "Motion") for Allowance and Payment of Administrative Expense Claim in this Court, pursuant to which Claimant seeks payment of: (i) a $50,000 retention bonus (the "Retention Bonus"); (ii) a $112,499.98 termination payment (the "Termination Payment"); and (iii) costs and attorney's fees, arising from an employment agreement between himself and Enron Global Markets LLC, a subsidiary of Enron Corp. ("Enron Global Markets"). Enron Corp. and its affiliated debtors are, collectively, a large, multifaceted national and international energy corporation with operations, including energy trading operations, and financial interests across the United States and around the world. Enron Corp. and its affiliated debtors, as debtors-in-possession, and the Official Committee of Unsecured Creditors of Enron Corp. and its affiliated debtors, as debtors-in-possession (the "Committee"), each filed an objection to the Motion on February 10, 2003 (together, the "Objections"). A hearing was held with regard to the Motion on March 6, 2003 (the "Hearing").

## II. Factual Background

Arnold began working for Enron Capital & Trade Resources, Corp. ("Enron Capital & Trade") in September 1997 as an analyst in the power marketing group. In March 1998, he transferred to Enron Capital & Trade's coal trading group where he worked for three years. Arnold entered into an Employment Agreement (the "Employment Agreement") with Enron Global Markets, effective as of March 1, 2001 (the "Effective Date"), with an expiration date of February 28, 2003 (the "Expiration Date"). In May 2001, Arnold became the head of trading for Enron Freight Markets.

On December 2, 2001 (the "Enron Petition Date"), Enron Corp. and certain of its affiliated debtor entities, including Enron

Capital & Trade and Enron Global Markets (collectively, "Enron," the "Company" or the "Debtors"), filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Since the Enron Petition Date, Debtors have continued to operate their businesses as debtors-in-possession pursuant to § 1107(a) of the Bankruptcy Code.

Arnold was selected by Enron as one of the individuals to facilitate the post-petition liquidation of the Company. Arnold assisted in the winding down of operations of Enron Freight Markets, and then of the coal and emissions trading group. Arnold's post-petition responsibilities included securing accounts receivable, liquidating physical inventory, and identifying and capturing value associated with non-terminated or improperly terminated forward contracts.

Arnold's pre-petition Employment Agreement provides for, among other terms, a $50,000 Retention Bonus payable to him on March 1, 2002 (the "Retention Bonus"). Section 2.2 of the Employment Agreement states that:

"2.2 *Termination by Employee.* Employee may terminate the employee relationship before the term expires for the following reasons:

a. *Breach by Company.* A material breach by Company of any material provision of this Agreement which remains uncorrected for 30 days following Employee's written notice to Company of such · breach. Upon such a termination, Employee shall be entitled to receive the Monthly Base Salary ... as if Employee's employment had continued for the full Term.

b. *Voluntary Termination.* For any other reason whatsoever, in Employee's sole discretion. Upon a Voluntary Termination before the

Term expires, all of Employee's future compensation and benefits ... shall cease as of the date of termination, and Employee shall be entitled only to pro rata salary through the termination date."

Arnold retained legal counsel in early-March 2002 and has been represented by counsel at all times since. By letter dated March 6, 2002 (the "March 6th Letter"), Claimant, by his attorney, advised Enron Global Markets that due to Enron Global Markets' failure to pay the Retention Bonus to Arnold on March 1, 2002, notice was being given of a material breach pursuant to Section 2.2(a) of the Employment Agreement. By letter dated April 26, 2002 (the "April 26th Letter"), Claimant, by his attorney, advised Enron Global Markets that as a result of Enron Global Markets' failure to pay the Retention Bonus to Arnold during the thirty-day cure period set forth in Section 2.2(a) of the Employment Agreement, Arnold's employment relationship with Enron Global Markets was terminated as of April 26, 2002. In the April 26th Letter, Claimant demanded that Enron Global Markets immediately remit the Retention Bonus and the Termination Payment to Claimant in full. Notwithstanding Arnold's assertion that the employment relationship was terminated, Claimant continued to report to work and, by letter dated May 24, 2002 (the "May 24th Letter" and, together with the March 6th Letter and the April 26th Letter, each a "Demand Letter" and collectively, the "Demand Letters"), advised Enron Global Markets that he would work through June 3, 2002 "in order to complete the sale of Enron's emission allowances and ensure a smooth transition of price risk management issues associated with the coal and emissions trading groups."

Enron Global Markets continued to pay Arnold a base salary of $125,000, consistent with the base salary set forth in the Employment Agreement, through mid-March 2002. At that time, Arnold received a raise of approximately six percent that was not specifically provided for under such agreement. Arnold continued to be paid this above-contract rate salary through his termination date on June 3, 2002. On July 15, 2002, Claimant commenced employment as a vice president of Constellation Power Source. On July 16, 2002, Claimant executed a General Release (the "General Release") in consideration of the final payment to be paid pursuant to the Enron Corp. Key Employee Retention, Liquidation Incentive and Severance Plan (the "KERP"), which had previously been approved by this Court on May 8, 2002. By letter dated July 17, 2002, Enron Global Markets demanded that Arnold repay an amount equal to $18,288.34, in accordance with the terms of the Employment Agreement, which required that Arnold return a pro rata portion of his signing bonus in the event that he voluntarily separated from the Company before February 28, 2003. On August 1, 2002, Enron Global Markets made a $14,267 payment to Claimant pursuant to the KERP. By letter dated August 12, 2002 (also, a "Demand Letter"), Claimant, by his attorney, again demanded that Enron Global Markets pay the Retention Bonus, the Termination Payment and all related attorney's fees accrued as of that date. Claimant filed the Motion on December 16, 2002. Enron and the Committee responded by filing the Objections on February 10, 2003. The Hearing was held on March 6, 2003.

## III. Discussion

### A. Legal Standard for Administrative Expense Claims

Claimant requests that the Court allows and compels payment of the Retention Bonus and the Termination Payment as administrative expense claims. The Court has previously discussed the legal standard regarding administrative claims in, among

other decisions, *In re Enron Corp.*, 279 B.R. 79, 84–88 (Bankr.S.D.N.Y.2002) and *In re Enron Corp.*, 279 B.R. 695, 704–07 (Bankr.S.D.N.Y.2002). Section 503(b)(1)(A) of the Bankruptcy Code provides a priority for "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case." Pursuant to § 507(a)(1) of the Bankruptcy Code, these expenses for administering the estate are afforded a first priority. Thus, expenses that the debtor-in-possession incurs during the reorganization effort are afforded a first priority. *In re Jartran, Inc.*, 732 F.2d 584, 586 (7th Cir.1984).

▪ This priority is based on the premise that the operation of the business by a debtor-in possession benefits pre-petition creditors; therefore, any claims that result from that operation are entitled to payment prior to payment to "creditors for whose benefit the continued operation of the business was allowed." *Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)*, 536 F.2d 950, 954 (1st Cir. 1976). While *Mammoth Mart* was decided under the former Bankruptcy Act, its analysis is applicable under the Bankruptcy Code. *In re Drexel Burnham Lambert Group Inc.*, 134 B.R. 482, 489 (Bankr. S.D.N.Y.1991). Administrative expenses are afforded a priority to facilitate the reorganization effort by encouraging third parties, who might be reluctant to deal with a debtor-in-possession, to transact such business. *Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 101 (2d Cir.1986) (citing *Mammoth Mart*, 536 F.2d at 953). Otherwise, absent this incentive, the third parties would refrain from dealing with the debtor-in-possession, thereby inhibiting the reorganization effort and harming pre-petition creditors. *Id.*

▪ Nevertheless, in light of the bankruptcy goal of providing equal distribution of a debtor=s assets to all creditors, priorities are narrowly construed. *Amalgamated Ins. Fund*, 789 F.2d at 100. Strictly construing the terms "actual" and "necessary" minimizes administrative expense claims by requiring that the estate receive a "real benefit from the transaction," thereby preserving the estate to benefit all creditors. *Drexel*, 134 B.R. at 488. If claims not intended to have priority are afforded such, the value of the priority for those creditors Congress intended to prefer would be diluted. *Mammoth Mart*, 536 F.2d at 953. It is important to note that once a debtor is in bankruptcy, an ordinary contract action between a provider of goods or services and the solvent recipient of such goods or services becomes a contest among the debtor's creditors to share in the distribution of the debtor's assets. *General Am. Transp. Corp. v. Martin (In re Mid Region Petroleum, Inc.)*, 1 F.3d 1130, 1133 (10th Cir. 1993). Any priority given to one creditor is done to the detriment of other creditors. *In re Patient Educ. Media, Inc.*, 221 B.R. 97, 101 (Bankr.S.D.N.Y.1998).

▪ The focus on allowance of a priority is to prevent unjust enrichment of the estate, not to compensate the creditor for its loss. *In re R.H. Macy & Co., Inc.*, 170 B.R. 69, 78 (Bankr.S.D.N.Y.1994). Thus, a court looks to the actual benefit to the estate as opposed to the loss sustained by a creditor. *In re CIS Corp.*, 142 B.R. 640, 642 (S.D.N.Y.1992). The claimant has the burden of establishing entitlement to the priority. *Drexel*, 134 B.R. at 489.

## B. Employment Agreement

### i. Claimant Is Not Entitled to the Retention Bonus Pursuant to the Terms of the Employment Agreement

▪ Claimant argues that "Arnold's claim arises from an employment agree-

ment between himself and Enron Global Markets, LLC. Post-petition, Arnold rendered actual and necessary services to Enron Global Markets, LLC. But Enron Global Markets, LLC failed to meet its obligation to pay a retention bonus pursuant to the terms of the employment agreement." (Claimant's Closing Summary in Support of Motion at 1). "Where the claim arises out of a contract between the debtor and the claimant, the 'creditor's right to payment will be afforded first priority only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of business.'" *In re Chateaugay Corp.*, 102 B.R. 335, 354 (Bankr.S.D.N.Y. 1989) (quoting *Mammoth Mart*, 536 F.2d at 954). For the reasons set forth below, the Court finds that Claimant is not entitled to the Retention Bonus or the Termination Payment pursuant to the terms of the Employment Agreement, and therefore that no amount of these claims will be afforded administrative expense priority.

■■■ The Employment Agreement states that it shall be governed by the laws of the State of Texas. As a general rule, choice of law provisions are considered valid and enforceable in the State of New York. *See Marine Midland Bank, N.A. v. United Mo. Bank, N.A.*, 223 A.D.2d 119, 123, 643 N.Y.S.2d 528 (N.Y.App.Div.1996); *Bossier Plaza Assoc. Ltd. P'ship v. Pierson*, 156 A.D.2d 246, 246, 548 N.Y.S.2d 507 (N.Y.App.Div.1989). Pursuant to Texas law, the meaning of an agreement is a question of law for the Court. Such meaning is determined by the language used therein, which is to be construed by the Court. Terms used in the contract are to be given their plain, ordinary and generally accepted meaning, unless the instrument itself shows the terms are used in a different sense. *Phillips Petroleum Co. v.*

*Gillman*, 593 S.W.2d 152, 154 (Tex.Civ. App.1980).

Exhibit A to the Employment Agreement sets forth the terms of the Retention Bonus, in relevant part, as follows:

"On March 1, 2002 [the first anniversary of the Effective Date], Company shall pay Employee a Retention Bonus in the amount of $50,000. If Employee voluntarily terminates his employment within six (6) months after receipt of a Retention Bonus, Employee must repay the entire Retention Bonus to Company within 30 days after his last day of Employment with Company."

Although Claimant was employed by Enron on March 1, 2002, his employment terminated on June 3, 2002. In order for Claimant to have been entitled to earn and retain the Retention Bonus, Claimant would have had to have satisfied either of the following two conditions: (i) been employed by Enron on March 1, 2002 and not have voluntarily terminated his employment within six months after receiving the Retention Bonus; or (ii) been employed by Enron on March 1, 2002 and have been involuntarily terminated by the Company at any time thereafter. Claimant argues that his employment relationship with the Company was terminated due to a "material breach of a material provision of the Agreement" that "had remained uncorrected for thirty days following the written notice to the Company of the breach" (Claimant's Memorandum of Law in Support of Motion at 6), and that Claimant had given notice to that effect via the May 24th Letter.

The Court finds that Claimant's employment with the Company was in fact terminated voluntarily pursuant to Section 2.2(b) of the Employment Agreement because: (i) the Employment Agreement does not indicate that a material breach constitutes an involuntary termination of

Claimant. Although Section 2.2(a) of the Employment Agreement indicates that, upon a material breach that is not cured following proper notice, Employee shall be entitled to terminate his employment and receive his monthly base salary for the remainder of the term, it does not state that such a breach constitutes an involuntary termination by the Company; (ii) even if Section 2.2(a) did provide that a material breach of the Employment Agreement constitutes an involuntary termination of Claimant, the Demand Letters violate the automatic stay afforded the Debtors by § 362 of the Bankruptcy Code, resulting in such letters being deemed void. Thus, the termination provisions of Section 2.2(a) would not be triggered, and Claimant's termination is rendered voluntary; and (iii) the facts of this proceeding do not support the proposition that Claimant was involuntarily terminated. Claimant continued to work at Enron, to receive his salary at an above-contract rate, and to earn additional compensation under the KERP until such time as he chose to terminate his employment and accept a position at Constellation Power Source. Equity does not justify compensating Arnold for his alleged "involuntary" termination when he continued to receive the benefits of his employment at Enron until he was prepared to commence employment elsewhere.

■ Section 2.2 begins *"Termination by Employee.* Employee *may* terminate the employment relationship before the Term expires for the following reason." (emphasis added). Section 2.2(a) then states that one such reason is *"Breach by Company.* A material breach by Company of any material provision of this Agreement which remains uncorrected for 30 days following Employee's written note to Company of such breach." Although, by employing the word "may," this section permits Claimant to choose to terminate the employment relationship in the event of a material breach, the section does not indicate that a material breach shall constitute an involuntary termination of Claimant. Although the provision likely releases the employee of his obligations under the contract, nowhere does the Employment Agreement indicate that a material breach by the Company constitutes an involuntary termination.

Section 2.1(b) of the Employment Agreement, entitled "Involuntary Termination," specifically provides that Claimant may be involuntarily terminated by the Company in the sole discretion of the Company. This section suggests that the parties chose to characterize a termination as involuntary in the Employment Agreement when appropriate, and their failure to do so in Section 2.2(a) weighs against a material breach by the Company being deemed an involuntary termination. Furthermore, Claimant's own papers distinguish between a termination resulting from a material breach by the Company pursuant to Section 2.2(a) and Claimant's involuntary termination. Claimant states in his Closing Summary in Support of Motion at 9:

> "In the event of a breach by the Company, the Agreement specifies that Mr. Arnold is entitled to receive his monthly base salary as if employment had continued for the full term. *In contrast, if Mr. Arnold had been involuntarily terminated by the Company,* the Agreement provides that Mr. Arnold is entitled to receive his monthly base salary as if employment had continued for the full term but only until Mr. Arnold accepts employment with a competitor, at which point the Company's obligation to pay Mr. Arnold ceases."

(emphasis added).

This distinction drawn by Claimant represents an acknowledgement that a mate-

rial breach by the Company does not equate to an involuntary termination. Therefore, for all of the above reasons, the Court finds that even if the notice requirements of Section 2.2(a) were met in this instance, the termination of the employment relationship is a voluntary termination by the Claimant pursuant to Section 2.2(b) of the Employment Agreement.

■ In the event that a material breach pursuant to Section 2.2(a) were to be construed as an involuntary termination of Claimant by the Company, then, as discussed in Section III(B)(iii) below, the fact that Claimant was enjoined by the automatic stay from providing notice to the Company of such material breach, and that the Demand Letters are therefore rendered void, would prevent the termination provisions of Section 2.2(a) from being triggered. Section 2.2(a) specifically provides that upon a material breach of the Employment Agreement, Claimant must give written notice of such breach so that the Company has 30 days to cure. However, since Claimant was enjoined from giving notice of any material breach, the termination provisions of Section 2.2(a) cannot be triggered. Thus, any involuntary termination that might be effectuated pursuant to Section 2.2(a) would not be triggered in this instance, and Claimant's termination of employment would be construed as a voluntary termination pursuant to Section 2.2(b).

■ Furthermore, the facts of this proceeding do not support the proposition that Claimant was involuntarily terminated. Claimant continued to work at Enron through June 3, 2002, when he chose to terminate his employment to accept a position at Constellation Power Source. Claimant received an above-contract rate salary from mid-March 2002 through June 3, 2002, and he remained eligible to earn additional compensation under the KERP.

In fact, Claimant received $14,267 pursuant to the KERP on August 1, 2002. Equity does not justify Arnold having continued to earn his salary and to qualify for the KERP until such time as he chose to accept other employment, only to later seek damages under the theory that he was involuntarily terminated. Claimant's actions, and the benefits that he reaped from them, are inconsistent with and fail to support Claimant's assertions that he was involuntarily terminated.

The Court notes that although Claimant never received the Retention Bonus, the earliest he could have done so would have been March 1, 2002. Since, pursuant to the terms of the Employment Agreement, Claimant was only eligible to retain the Retention Bonus if he did not voluntarily terminate his employment within six months of receiving such bonus, Claimant would not have been able to retain the Retention Bonus if he voluntarily terminated his employment prior to September 1, 2002 at the earliest, six months after March 1, 2002. For the reasons discussed above, this Court finds that Claimant voluntarily terminated his employment pursuant to Section 2.2(b) on June 3, 2002, three months prior to the expiration of the six-month period. Therefore, according to the terms of the Employment Agreement, since Claimant voluntarily terminated his employment prior to September 1, 2002, the earliest possible date that Claimant could have voluntarily terminated his employment and still retained the Retention Bonus, Claimant would not have been entitled to retain the Retention Bonus.

### ii. Claimant Is Not Entitled to the Termination Payment Under the Terms of the Employment Agreement

As previously discussed, Section 2.2(a) of the Employment Agreement provides that upon a material breach by the Company of any material provision which remains un-

corrected for thirty days following Claimant's written notice, Claimant shall be entitled to receive his monthly base salary for the remainder of the agreement's term. Since, as discussed in Section III(B)(iii) below, Claimant was enjoined by the automatic stay from delivering the notice referenced in Section 2.2(a), Claimant is not entitled to the Termination Payment under the terms of the Employment Agreement.

The need for Claimant to provide notice in order to be entitled to the Termination Payment is emphasized in Section 4.3 of the Employment Agreement, which states:

> "*No Waiver. Other than as described in Section 2.2(a),* no failure by either party at any time to give notice of any breach by the other party of, or to require compliance with, any condition or provisions of this Agreement shall be deemed a waiver of any provisions or conditions of this Agreement." (emphasis added).

Section 2.2(a) specifically is carved out from the above provision that a failure to give notice of a breach of the Employment Agreement shall not be deemed a waiver of any condition of such agreement. The exclusion of Section 2.2(a) from this "no waiver" provision suggests that the failure to give notice under Section 2.2(a) represents a waiver of the Termination Payment. Thus, the Employment Agreement makes clear that without satisfying Section 2.2(a)'s notice requirement, Claimant is not entitled to the Termination Payment. Once again, since the Demand Letters are rendered void by the automatic stay, Claimant is deemed not to have given notice and is not entitled to such payment.

### iii. The Automatic Stay Enjoined Claimant from Delivering Notice Pursuant to Section 2.2(a) of the Employment Agreement

Section 362 of the Bankruptcy Code operates, immediately upon a debt-or's filing of a bankruptcy petition, to, *inter alia,* stay automatically any act to transfer control over property of the estate. *See Shimer v. Fugazy (In re Fugazy Express, Inc.),* 982 F.2d 769, 776 (2d Cir. 1992). "[T]he purpose of the automatic stay is to give the debtor a breathing spell from creditors, to stop all collection efforts, and to permit the debtor to attempt repayment or reorganization." *Computer Communications, Inc. v.Codex Corp. (In re Computer Communications, Inc.),* 824 F.2d 725, 729 (9th Cir.1987). *See also Shugrue v. Air Line Pilots Ass'n, Int'l (In re Ionosphere Clubs, Inc.),* 922 F.2d 984, 989 (2d Cir.1990). The stay protection in § 362 is automatic and mandatory with the filing of the petition. *Elder–Beerman Stores Corp. v. Thomasville Furniture Indus. Inc. (In re Elder–Beerman Stores Corp.),* 195 B.R. 1019, 1023 (Bankr. S.D.Ohio 1996) (citing *Cathey v. Johns–Manville Sales Corp.,* 711 F.2d 60, 62 (6th Cir.1983)).

Section 362(a)(3) of the Bankruptcy Code provides in relevant part that:

> "(a) ... [A] petition filed under section 301, 302, or 303 of this title ... operates as a stay, applicable to all entities, of—
>
> (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."

Section 541(a)(1) of the Bankruptcy Code broadly defines property of the estate to include, "[a]ll legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541 (2003). *See also 48th Street Steakhouse, Inc. v. Rockefeller Group, Inc. (In re 48th Street Steakhouse, Inc.),* 835 F.2d 427, 430 (2d Cir.1987); *In re Computer Communications, Inc.,* 824 F.2d at 729.

"Courts have consistently held that contract rights are property of the estate, and that therefore those rights are protected by the automatic stay." *In re Elder–Beerman Stores Corp.*, 195 B.R. at 1023 (citations omitted). Employment agreements have been held to be executory contracts. See *In re Hooker Invs., Inc.*, 145 B.R. 138, 144 (Bankr.S.D.N.Y.1992); *In re Jamesway Corp.*, 199 B.R. 836, 843 (Bankr. S.D.N.Y.1996). Thus, the Court finds that the Employment Agreement is property of Debtors' estate and is subject to the protection of the automatic stay.

■ The Court further finds that, in forwarding the Demand Letters to the Company, Claimant violated the automatic stay. In attempting to enforce the Employment Agreement by procuring payment of the Retention Bonus and the Termination Payment, and by sending notice of the termination of such agreement, Claimant acted to obtain possession of property of the estate and to exercise control over property of the estate. *See Skeen v. Denver Coca–Cola Bottling Co. (In re Feyline Presents, Inc.)*, 81 B.R. 623, 626 (Bankr.D.Colo.1988) (citing *N.L.R.B. v. Bildisco*, 465 U.S. 513, 532, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984)) (holding that an executory contract under Chapter 11 is not enforceable against the debtor party); *also In re Computer Communications, Inc.*, 824 F.2d at 728 ("Even if [defendant] had a valid reason for terminating the Agreement, it still was required to petition the court for relief from the automatic stay under § 362(d)."); *Slater v. Smith*, 152 B.R. 794, 806 (Bankr.W.D.N.Y.1993) (acknowledging that "[t]he Ninth Circuit Court of Appeals has on three occasions stated that an executory contract that is property of the estate can only be terminated after a grant of relief from the [automatic] stay."); *In re Elder–Beerman Stores Corp.*, 195 B.R. at 1023 ("Courts have ... consistently held that the automatic stay ... applies to notices of termination.") (citations omitted). Therefore, by seeking to enforce the terms of the Employment Agreement, and by unilaterally seeking to terminate same and invoke its damages provisions, the Court finds that Claimant violated the automatic stay.

■ The Second Circuit has held that actions taken in violation of the automatic stay are void and without effect. *See In re 48th Street Steakhouse, Inc.*, 835 F.2d at 431 (citing 2 L. King, *Collier on Bankruptcy* § 362.11 (15th ed.1987)). See also *Federal Ins. Co. v. Sheldon*, 150 B.R. 314, 319 (S.D.N.Y.1993) ("... actions taken in violation of the stay are void even where the acting party had no actual notice of the stay."). As previously discussed, since the Demand Letters are rendered void, the Court construes Section 2.2(a) of the Employment Agreement as if the requisite notice was not provided by Claimant. Therefore, without having given notice of the alleged material breach, Claimant is not entitled to the Termination Payment. The Court also notes that if it were to construe Section 2.2(a) as indicating that an uncured material breach of the Employment Agreement constitutes an involuntary termination of Claimant by the Company, the fact that the Demand Letters are deemed void would still render Claimant's termination voluntary pursuant to Section 2.2(b) and bar his entitlement to retain the Retention Bonus as well.

Claimant argues that, by sending the July 17, 2002 letter demanding repayment of a pro rata portion of Claimant's signing bonus (the "July 17th Demand Letter"), Debtors are estopped from asserting that the Demand Letters violate the automatic stay, or, alternatively, that Debtors waived the automatic stay. The Court disagrees with Claimant's arguments.

It is well settled that, since the purpose of the automatic stay is to protect creditors as well as the debtor, the debtor may not waive the stay. *See Commerzanstalt v. Telewide Sys., Inc.,* 790 F.2d 206, 207 (2d Cir.1986); *also In re Fugazy Express,* 982 F.2d at 776 ("Unless lifted by the court, the stay remains in effect until the case is concluded."); *Constitution Bank v. Tubbs,* 68 F.3d 685, 691 (3d Cir. 1995) ("The automatic stay cannot be waived. Relief from the stay can be granted only by the bankruptcy court having jurisdiction over a debtor's case."). Since the automatic stay cannot be waived by the Debtors, and given the import of the stay in protecting the Debtors' creditors as well as the Debtors themselves, the Court is not persuaded by Claimant's reasoning that the Company's sending the July 17th Demand Letter impacts the Court's conclusion that Claimant's Demand Letters violated the automatic stay.

The Court notes that Claimant, who, as previously stated, was represented by counsel beginning in early-March 2002, had two remedies at his disposal that were not pursued. First, Claimant could have petitioned the Court to life the automatic stay pursuant to § 362(d) of the Bankruptcy Code, in an effort to obtain Court approval to give notice of the alleged breach as required by Section 2.2(a) of the Employment Agreement. Section 362(d) provides, in relevant part, that the Court shall grant relief from the stay in appropriate circumstances "[o]n request of a party in interest and after notice and a hearing." *In re Fugazy Express, Inc.,* 982 F.2d at 776; *In re Computer Communications, Inc.,* 824 F.2d at 728. However, rather than pursuing relief from the stay, Claimant opted to engage in "self-help" by sending the Demand Letters. As stated in *In re Fugazy Express, Inc.,* 982 F.2d at 776, "[n]othing in the Code suggests that a party is entitled to engage in 'self-help' in derogation of the automatic stay."

As an alternative remedy, Claimant could have moved for an order requiring the Company to make an early election to assume or reject the Employment Agreement pursuant to § 365(d)(2) of the Bankruptcy Code. *See In re Feyline Presents,* 81 B.R. at 626. Under § 365(d)(2), any party to an executory contract may request that the court fix a time within which the debtor must assume or reject an executory contract. *In re Enron Corp.,* 279 B.R. at 702. However, once again, Claimant failed to take the measures prescribed by bankruptcy law and instead chose to pursue a "self-help" remedy, resulting in a violation of the automatic stay. Therefore, all enforcement actions taken by Claimant prior to the assumption or rejection of the Employment Agreement by the Company are barred. *See In re El Paso Refinery, L.P.,* 220 B.R. 37, 43 (Bankr.W.D.Tex. 1998).

The Court notes that in continuing to employ Arnold, the Employment Agreement was not assumed by the Company by implication. A debtor's decision to elect to receive benefits under a contract post-petition does not translate into an obligation to assume the contract, because a debtor cannot assume a contract by implication. *See Mason v. Official Comm. of Unsecured Creditors for FBI Distribution Corp. and FBC Distribution Corp. (In re FBI Distribution Corp.),* 330 F.3d 36, 45 (1st Cir.2003) (noting that, absent a court-approved assumption, an executory contract cannot be assumed by the unilateral acts of the debtor-in-possession). The assumption of a contract cannot be implied because notice to creditors and court approval is specifically required before contractual burdens can be imposed on an estate. *In re Child World,* 147 B.R. 847, 852 (Bankr.S.D.N.Y.1992). "Court

approval ... provides protection to the unsecured creditors whose claims could be prejudiced by potentially burdensome contracts—ones that may have driven the business into bankruptcy in the first place ... It also insures that the [Unsecured Creditors] Committee has an opportunity to object." *In re FBI Distribution Corp.,* 330 F.3d at 45.

In summary, since the Demand Letters violated the automatic stay, the Court finds that they are void. Therefore, Claimant did not satisfy the notice requirement of Section 2.2(a) of the Employment Agreement and is not entitled to receive the Termination Payment. With regard to the Retention Bonus, as previously discussed, the Court finds that the Employment Agreement does not construe a material breach by the Company pursuant to Section 2.2(a) as constituting an involuntary termination of the Claimant, nor does Claimant's continued employment by the Company support a finding that he was involuntarily terminated. Thus, Claimant's termination is deemed voluntary pursuant to Section 2.2(b) of the Employment Agreement and, having voluntarily terminated his employment within six month of the earliest possible time that he could have received the Retention Bonus, Claimant would not be entitled to retain such bonus. Moreover, even if the Court did construe a material breach by the Company pursuant to Section 2.2(a) as constituting an involuntary termination of Claimant, the Court's finding that the Demand Letters violated the automatic stay would prevent such involuntary termination from being triggered, thereby rendering Claim-

ant's termination voluntary. Therefore, under no circumstances would Claimant be entitled to retain the Retention Bonus pursuant to the terms of the Employment Agreement. Given that Claimant is not entitled to the Retention Bonus or the Termination Payment pursuant to the Employment Agreement, the Court finds that no amount of the Retention Bonus or the Termination Payment shall be classified as an administrative expense claim.[1]

### C. Any Claims to the Termination Payment Were Released by the General Release

On July 16, 2002, Claimant executed the General Release in consideration of the final payment to be paid pursuant to the KERP. Debtors and the Committee argue that the General Release releases all of Claimant's claims relating to the Retention Bonus and the Termination Payment. As discussed above, the Court finds that Claimant is not entitled to the Retention Bonus or the Termination Payment pursuant to the terms of the Employment Agreement. However, if Claimant were to possess valid claims relating to the Retention Bonus and the Termination Payment under the Employment Agreement, all claims relating to the Termination Payment would be released under the General Release, while claims relating to the Retention Bonus would not.

Section 2(a) of the General Release provides for Claimant's "complete waiver of all rights and claims that may have arisen, whether known or unknown, up until the date this General Release is signed," including but not limited to:

---

**1.** Although the Court need not reach the issue, the Court notes that, even if the Court were to find that Claimant is entitled to the Retention Bonus pursuant to the Employment Agreement, the benefit that the Debtors received from Claimant's employment was most likely received over a period reaching both

pre and post-petition. Thus, Claimant would be entitled only to an administrative claim for that portion of such bonus that directly relates to the benefit to Debtors derived from post-petition services provided by Claimant. *Mammoth Mart,* 536 F.2d at 954; *Amalgamated Ins. Fund,* 789 F.2d at 101.

"Any and all claims under the law of any jurisdiction relating to employment or the termination of employment, including, but not limited to, wrongful discharge of employment; constructive discharge from employment; termination in violation of public policy; breach of contract, both express and implied; any plans or policies providing for severance payments upon the termination of employment except as contained in the KERP Plan, and any and all claims arising out of any other laws and regulations relating to employment or employment discrimination . . ."

Section 3(d) of the General Release goes on to carve out from the above list of claims, "my [Claimant's] right to any compensation (including wages, salary, commissions, bonus and paid time off) earned during the course of my employment with the Company on or after December 2, 2001 [the Enron Petition Date] . . ." (the "Release Carve Out"). The Retention Bonus falls within the Release Carve Out, thereby excepting it from the list of released claims. However, the Termination Payment does not fall within the Release Carve Out, and was therefore released by the General Release.

Both parties have cited to Texas law with regard to the legal standard that the Court is to apply in interpreting the General Release. As stated above, pursuant to Texas law, the meaning of an agreement is a question of law for the Court. Such meaning is determined by the language used therein, which is to be construed by the Court. Terms used in the contract are to be given their plain, ordinary and generally accepted meaning, unless the instrument itself shows the terms are used in a different sense. *Phillips Petroleum*, 593 S.W.2d at 154.

█ Debtors argue that Claimant's claims to the Retention Bonus are released by the General Release. Exhibit A of the Employment Agreement specifies that the Company shall pay Arnold an amount of $50,000 on March 1, 2002. Although, as discussed in Footnote 1 above, any benefit that the Company might have anticipated receiving at the time of the Employment Agreement's execution in consideration of the Retention Bonus most likely occurred over a period reaching both pre and post-petition, the language of the Employment Agreement makes clear that such bonus was actually earned on March 1, 2002. Since the Release Carve Out specifically excludes from the release any compensation earned by Claimant after the Enron Petition Date, including bonus, and given that the Court finds that the Retention Bonus was earned by Claimant after such petition date, Claimant's claims to the Retention Bonus were not released by the General Release.

█ On the other hand, the plain language of the General Release makes clear that all claims to the Termination Payment are released. The General Release releases claims "relating to employment or the termination of employment, including, but not limited to, . . . breach of contract . . . [and] any plans or policies providing for severance payments upon the termination of employment except as contained in the KERP Plan." The Termination Payment clearly falls within the parameters of a released claim. Section 2.2(a) specifies that the Termination Payment is triggered by the termination of Claimant's employment, and any such termination is necessarily related to a material breach of the Employment Agreement. Since, as discussed below, the Court views the Termination Payment not as severance but as damages for breach of contract, and Claimant himself characterizes his claim as stemming from a breach of the Employment Agreement, the Termination Pay-

ment is covered by the release of claims for breach of contract.

The General Release also provides for the release of all payments relating to the termination of Claimant's employment, including severance payments not contained in the KERP. The Court notes that the KERP is a retention, liquidation incentive and severance plan. Therefore, even if the Court were to construe the Termination Payment as severance, payment of the Termination Payment would be redundant with the purposes of the KERP. The General Release's language suggests an intent to eradicate this redundancy by releasing the Company from all of Claimant's claims relating to the termination of his employment with the exception of the KERP.

Claimant argues that the Termination Payment is covered by the Release Carve Out as compensation earned after the Enron Petition Date. In support of this position, Claimant points towards a string of cases rooted in *Straus–Duparquet, Inc. v. Local Union No. 3, Int'l Bhd. of Elec. Workers, AFL–CIO*, 386 F.2d 649 (2d Cir. 1967). *Straus–Duparquet* stands for the propositions that severance pay: (i) is compensation for the termination of employment; (ii) is earned in full upon an employee's termination; and (iii) may be an expense of administration. *Id.* at 651. The Court notes that *Straus–Duparquet* was decided under the old Bankruptcy Act. The Second Circuit has not addressed the *Straus–Duparquet* proposition under the Bankruptcy Code, and courts are split over whether it survives. *In re Ralph Lauren Womenswear, Inc.*, 197 B.R. 771, 775 (Bankr.S.D.N.Y.1996). Claimant uses the findings of *Straus–Duparquet* to advance his theory that the Termination Payment should be considered post-petition compensation, which is exempt from the General Release pursuant to Section 3(d) of such release.

The Court finds that the *Straus–Duparquet* analysis is inapplicable to the proceeding at hand, because the proper classification of the Termination Payment is as damages as opposed to severance pay. The Second Circuit has held that severance pay policies serve two objectives: first, to protect employees from the economic hardship of joblessness, and second, to reward employees for past service to the company. *Bradwell v. GAF Corp.*, 954 F.2d 798, 801 (2d Cir.1992). The Termination Payment cannot be regarded as a reward for past service to the Company, since the amount of such payment decreases the longer Claimant is employed. The amount of the Termination Payment is connected to the length of time remaining under the Employment Agreement at termination, thus yielding a smaller payment the longer Arnold remained at the Company. This approach is antithetical to the stated objectives of severance payment policy. *In re Hooker Invs., Inc.*, 145 B.R. at 150.

Although the Termination Payment could be construed as protecting Claimant from the economic hardship of joblessness, it does not fit the profile of severance pay as described in *Straus–Duparquet*, nor does the Termination Payment possess the elements of severance as they are generally understood. Section 2.2(a) of the Employment Agreement never uses the term "severance," while Rule 25 of the collective agreement addressed in *Straus–Duparquet* specifies that it relates to "severance pay." *Straus–Duparquet*, 386 F.2d at 650. Additionally, the severance pay found in *Straus–Duparquet* indicates a specific period of time for which an employee had to have been employed in order to receive payment, and provides a concrete amount for such payment. On the other hand, as previously discussed, the Termination Payment is tied to the period remaining in the

Employment Agreement at the time of termination and diminishes as that period grows shorter. Thus, the Court finds that the characteristics of the Termination Payment are distinguishable from the characteristics of the severance pay described in *Straus–Duparquet,* and from those of severance pay as they are generally understood.

Finally, the language used by Claimant in articulating his argument suggests that the Termination Payment should be construed as damages as opposed to severance pay. In the Motion, Claimant asserts, "... Enron Global Markets, LLC failed to meet its obligation to pay a retention bonus pursuant to the terms of the employment agreement. This breach resulted in a termination of the agreement—*giving rise to specified damages.*" (Motion at 1–2) (emphasis added). Arnold further asserted in his Closing Summary that in calculating the payments sought in the Motion, he "simply followed *the damage calculation provisions of the Agreement.* As discussed above, *the damage calculation* provides a larger amount due Mr. Arnold and does not require any mitigation on his part" (Closing Summary in Support of Motion at 20) (emphasis added), and "[t]he Agreement is clear with respect to the damages due Mr. Arnold." *Id.* at 8. The characterization of the Termination Payment as "damages" in Claimant's papers further supports the Court's finding that such payment should not be considered "severance pay."

Given the characteristics of the Termination Payment, the fact that the Termination Payment is distinguishable from the severance payment discussed in *Straus–Duparquet,* and Claimant's own characterization of the Termination Payment, the Court finds that the Termination Payment is properly classified as damages as opposed to severance pay. Therefore, the

court's holding in *Straus–Duparquet* that severance payment is compensation earned upon an employee's termination is inapplicable to this proceeding.

However, even if the Court had found that the Termination Payment should be construed as severance payment, the General Release makes clear that any claims to such payment are released nevertheless. The plain language of the General Release clearly indicates that claims relating to severance payment, with the exception of the KERP, are released by Claimant. The Court does not find any ambiguity in the language or intent of the General Release. Therefore, in the event that the Court were to view the Termination Payment as severance, to allow Claimant's proposed use of the *Straus–Duparquet* analysis would be to circumvent the unambiguous intent of the General Release, which releases claims relating to severance payments and the termination of employment. Furthermore, the Court notes that, although not dispositive, severance payment is not listed among the examples of "compensation" found in Section 3(d), which include wages, salary, commissions, bonus and paid time off. The Court recognizes that this list is not limiting, but the exclusion of severance payments from it, along with the unambiguous inclusion of claims relating to severance payments and the termination of employment in the Section 2(a) list of released claims, supports the Court's view that the Termination Payment is not carved out of the claims released by Claimant.

Throughout Claimant's papers, Claimant refers to his claim as stemming from Enron's alleged breach of the Employment Agreement. Claims relating to breach of contract, and claims rooted in Claimant's employment and termination in general, are clearly released by Section 2(a) of the General Release. Since the Termination

Payment is not excluded from the release as "compensation" by the Release Carve Out, even if the Court had held that Claimant was entitled to the Termination Payment pursuant to the terms of the Employment Agreement, the Court finds that all of Claimant's claims relating to such payment were released by the General Release.

### D. Claimant Is Not Entitled to Quantum Meruit Recovery for Benefits Conferred Post–Petition

Claimant contends that he is entitled to recover in *quantum meruit* for post-petition services rendered to the Company. "[I]t undisputable [sic] that a claimant is entitled to a *quantum meruit* recovery for benefit conferred post-petition." *In re Ralph Lauren Womenswear, Inc.*, 197 B.R. at 776. If the debtor-in-possession elects to continue to receive benefits from another party pending a decision to reject or assume a contract, "the debtor-in-possession is obligated to pay for the reasonable value of those services which, depending on the circumstances of a particular contract, may be what is specified in the contract." *Bildisco*, 465 U.S. at 531, 104 S.Ct. 1188 (citations omitted). *See also In re Ralph Lauren Womenswear, Inc.*, 197 B.R. at 776 (citing *Teamsters Local No. 310 v. Ingrum (In re Tucson Yellow Cab Co., Inc.)*, 789 F.2d 701 (9th Cir.1986)) (acknowledging that the Ninth Circuit previously held that a rejected collective bargaining agreement was "a fair measure of the value of the services that were rendered during the period that the decision to reject or assume the contract was pending."); *In re FBI Distribution Corp.*, 330 F.3d at 44 (finding that although an employment agreement may be probative of the reasonable value of post-petition services, it is not the dispositive measure).

Recovery in *quantum meruit* is appropriate in order to prevent the unjust enrichment of the party benefited by the work. *In re Chateaugay Corp.*, 139 B.R. 598, 606 (Bankr.S.D.N.Y.1992). In determining the amount of a *quantum meruit* claim, the court looks not only towards the benefit to the estate, but also to the bargain between the parties and the consideration due the creditor for providing such benefit. *In re Ralph Lauren Womenswear, Inc.*, 197 B.R. at 777. As an initial matter, if the Court were to use the Employment Agreement as a yardstick in determining the value of post-petition services rendered by Arnold to the Company, then the Court notes that, as discussed in Section III(B) above, since Claimant is not entitled to either the Retention Bonus or the Termination Payment pursuant to the terms of the Employment Agreement, such use of the agreement does not benefit Claimant's *quantum meruit* argument. Moreover, upon reviewing the post-petition services provided by Claimant to the Company, along with the compensation paid to Claimant in consideration of such services, the Court finds that Claimant has failed to establish that he was paid less than reasonable value for his efforts.

The Court notes that Arnold was paid the $125,000 base salary set forth in the Employment Agreement through mid-March 2002, at which time he received a raise of approximately six percent that was not specifically provided for under such agreement. Claimant acknowledged that the raise resulted in his being paid more than the Employment Agreement stipulated. (Hearing Transcript at 18:18–22). Beyond receiving his base salary, Claimant also participated in Enron's KERP. Claimant received $14,267 pursuant to the KERP, and was eligible to further receive between $100,000 and $200,000 under the KERP's liquidation incentive program had

he remained employed by the Company. (Hearing Transcript at 28:21–29:9).

The purpose of the KERP is to enable Debtors to "provide a financial incentive for continued employment and assure its employees that they will be rewarded for dedicated service towards the Debtors' reorganization effort." (Debtors' Motion for Approval of Key Employee Retention Program, March 29, 2002, at 3). "The KERP addresses the need to provide Key Employees with an opportunity to earn cash compensation beyond base salaries in order to minimize Key Employee turnover, to attract highly competent new employees, and to motivate all Key Employees to work diligently and productively not only to maximize enterprise value but also to achieve a successful conclusion of the chapter 11 cases." *Id.* at 8. Claimant acknowledged his understanding of the goals of the KERP when asked whether there was any post-petition contract between Claimant and Enron tying Claimant's compensation to the amount of money Claimant generated for Enron. In response Claimant testified, "[t]here's no contract. *I believe that was the aim of the KERP.*" (Hearing Transcript 44:9–14) (emphasis added).

When the Employment Agreement was executed in March 2001, Enron was seeking to build its trading business. This necessitated offering competitive contractual terms, such as the Retention Bonus, to attract and retain traders and other employees whose skills and efforts would contribute to the growth of Enron's trading presence. However, after the Enron Petition Date, the Company no longer took a long-term view with regard to those trading units that would not move forward as going concerns. This included the trading units with which Claimant was affiliated, which Enron determined would be liquidated. Given that Enron no longer had long-term aspirations for these units, the KERP was a more appropriate form of compensation for Claimant than the Retention Bonus. Whereas the Retention Bonus, implemented by the parties pre-petition, sought to incentivize Claimant to remain at Enron while the Company grew its trading business, the KERP provided incentives geared specifically toward the liquidation of the trading units in which Claimant was employed. The Retention Bonus was agreed to pre-petition in order to promote goals drastically different from those of the Company post-petition. Claimant has not refuted this by demonstrating that the Retention Bonus remained relevant to his employment at Enron after the Enron Petition Date, or that the KERP failed to provide sufficient actual and potential compensation for Claimant's post-petition services.

With regard to the Termination Payment, as discussed above, the Court has found that Claimant voluntarily terminated his employment. Had Claimant opted to remain employed by Enron, he had the opportunity to earn an additional $100,000 to $200,000 beyond his base salary under the KERP's liquidation incentive program. However, Claimant chose to forsake the opportunity to earn this payment and to leave his position voluntarily, thereby removing the possibility that he would be entitled to a *quantum meruit* recovery for the Termination Payment. The Court finds that providing the Termination Payment in *quantum meruit* to an employee who voluntarily terminated his employment is not justified by principles of equity.

In summary, the Court finds that the combination of Claimant's post-petition base salary, the $14,267 KERP payment received by Claimant, and the potential to earn an additional $100,000 to $200,000 had Claimant remained employed by the Company, adequately compensated Claimant

for his post-petition efforts. Having failed to demonstrate otherwise, the Court denies Claimant's attempt to recover additional amounts in *quantum meruit*.

### IV. Conclusion

The Court finds that no amount of the Retention Bonus or the Termination Payment shall be allowed as an administrative expense claim. Claimant is not entitled to the Retention Bonus or the Termination Payment pursuant to the terms of the Employment Agreement. Claimant is not entitled to the Retention Bonus as a result of the Court's finding that Claimant voluntarily terminated his employment within six months of March 1, 2002, the earliest possible date that would have allowed Claimant to retain the Retention Bonus. Furthermore, Claimant is not entitled to the Termination Payment because the Court finds that Claimant violated the automatic stay by sending the Demand Letters to the Company, thereby preventing the termination provisions of Section 2.2(a) from being triggered. Even if the Court had found that Claimant was entitled to the Termination Payment pursuant to the terms of the Employment Agreement, the General Release bars Claimant's claims to such payment.

Lastly, the Court finds that Claimant was sufficiently compensated for his post-petition services, thereby leading the Court to deny Claimant's attempt to recover additional amounts in *quantum meruit*.

Therefore, for the reasons set forth herein, it is hereby:

ORDERED, that the Motion, in its entirety, is denied.